UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                :

MARION J. CAFFEY and WILLETTE        :         04 Civ. 313 (RJH)
KLAUSNER,                                  :
                        Plaintiffs,       :
                                    :

        -against-                 :      **MEMORANDUM OPINION**
                                    :          **AND ORDER**
                                    :

VICTOR TRENT COOK, RODRICK DIXON    :
and THOMAS YOUNG,                   :
                      Defendants.     :
                                    :
------------------------------------------------------------x

Plaintiffs Marion J. Caffey and Willette Klausner (collectively "plaintiffs") brought this copyright action pursuant to 17 U.S.C. § 101 *et seq*. against Victor Trent Cook, Rodrick Dixon and Thomas Young (collectively "defendants"), asserting that defendants infringed on plaintiffs' copyright in a compilation of pre-existing musical compositions and bridge dialogue embodied in a musical show styled as "The Three Mo' Tenors" (the "Show").[1] Following the denial of plaintiffs' motion for summary judgment on this claim, the Court conducted a bench trial on various dates between June 14, 2005 and July 15, 2005. This Memorandum Opinion and Order sets forth the findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

---

[1] Cook, Dixon and Young, originally the plaintiffs in this action, initially brought a trademark infringement suit against Caffey, originally the defendant, asserting rights in the name "The Three Mo' Tenors." Following defendants' withdrawal of their complaint pursuant to Rule 11 of the Federal Rules of Civil Procedure, the caption was reformed to reflect the remaining counterclaim for copyright infringement asserted by Caffey.

**FINDINGS OF FACT**

I.     <u>The Parties</u>

Plaintiff Marion J. Caffey has been a writer, choreographer, producer and director of live musical theater and concerts since 1981.  He has directed and/or choreographed numerous musical stage shows, including *Bowfire*, *Storyville*, *Forever Plaid*, *Jelly Roll: The Music and the Man*, *Little Shop of Horrors*, *Tintypes*, *The All Night Strut*, *Ain't Misbehavin'*, *Purlie Victorious*, *Ruthless*, *Lady Day at Emerson's Bar & Grill*, and *Spunk.*  He has also conceived and written the musical shows *Street Corner Symphony* which opened on Broadway, *Cookin' at the Cookery (The Music and Times of Alberta Hunter)*, *Blackbirds of Broadway*, and *Three Mo' Divas.*   (Declaration of Marion J. Caffey ("Caffey Decl.") ¶¶ 1, 2.)

Plaintiff Willette M. Klausner is currently the sole shareholder and principal of Edgework Productions, Inc.  Klausner has produced, co-produced and developed numerous theatrical projects involving musical theater and live stage shows.  (Declaration of  Willette M. Klausner ("Klausner Decl.") ¶¶ 1, 2.)  On June 14, 2005 Caffey assigned any copyright interests he held in the Show to Klausner.  (Marion J. Caffey Trial Testimony ("Caffey Tr.") 275.)

Defendant Victor Trent Cook is a classically trained counter-tenor by profession. Following high school, Cook was crowned the "$100,000 Male Vocal Champion!" by the popular television series *Star Search*.  Cook has since appeared in numerous off-Broadway and Broadway productions and has received a Tony Award nomination for his role in the Broadway production *Smokey Joe's Café*.  (Declaration of Victor Trent Cook ("Cook Decl.") ¶ 2.)

Defendant Rodrick Dixon is a classically trained lyric tenor with a Master of Art degree. (Declaration of Rodrick Dixon ("Dixon Decl.") ¶ 2.) Dixon has performed as a vocalist with symphonies throughout the world and has appeared in a wide variety of genres including opera, Broadway and musical theater. (*Id*.)

Defendant Thomas Young is also a classically trained lyric tenor and has appeared as a principal soloist in major concert halls and opera houses in approximately twenty countries. (Declaration of Thomas Young ("Young Decl.") ¶ 2.) Young is a tenured professor at Sarah Lawrence College and has worked in musical theater, including productions of *Porgy and Bess*, *The Wiz* and *Evita*. He has extensive recording and jazz credits including a 1992 album, *High Standards*, which featured two songs, *Twisted* and *Send in the Clowns* that were among the songs subsequently incorporated into the show. (*Id*.)

II.  Creation of the Show

In 1997, Caffey developed the idea for a musical stage show which he ultimately named *Three Mo' Tenors.* He was inspired by the performances of "The Three Tenors" – Luciano Pavarotti, Placido Domingo and Jose Carreras – and sought to create a similar concert involving three African-American tenors performing diverse musical genres, including classical, Broadway, jazz, blues, soul and gospel. (Caffey Decl. ¶ 4.) Caffey believed that African-American tenors "were more likely to be able to adapt to the many various musical genres and could sing Broadway, blues, etc. without sounding like opera singers, making the concept and the show unique." (*Id*.) All of the parties agree that Caffey "conceived" the idea for the Show.[2] (Young Decl. ¶ 6.)

---

[2] As some point Caffey sought to register *Three Mo' Tenors* as a trademark. Registration was denied and there are no trademark claims before the Court.

Caffey had known Young for over ten years, admired his work, and invited him to participate in the project in early 1998. (*Id.* ¶ 12; Young Tr. 316-18.) Caffey was also familiar with Cook's work and had produced a concert for him in which Cook sang multiple musical genres. (Caffey Decl. ¶ 14.) When Caffey approached Cook, Caffey stated that "[h]e told me he got an idea from the actual three tenors. And he knew of three specially trained African-American tenors who he thought would be tailor-made for this idea, he had, which was a take-off for the Three Tenors." (Victor Trent Cook Trial Testimony ("Cook Tr.") 143; Thomas Young Trial Testimony ("Young Tr.") 316.) Caffey also stated that he wanted the show to include a "multitude" of genres. (Cook Tr. 144.) Upon Cook's recommendation, Caffey invited Dixon to participate in a "showcase performance" in 1998 which had been arranged by Caffey to solicit investors in the Show. (Cook Tr. 150; Caffey Decl. ¶ 18.)

The showcase performance took place on November 19, 1998. Cook, Dixon and Young participated in the performance along with a fourth tenor, Jeff Haerston. *(Id.)* Caffey asked each of the performers to suggest songs from their own repertoire. (Caffey Decl. ¶ 18.) He [selected and] sequenced fourteen songs. (Pls.' Ex. 35.) Cook testified that he, Young and Dixon "came to the table with our own repertoire." (Cook Tr. 195.) Young performed two of the songs in his standard repertoire – *Nessun Dorma!*, and *Send in the Clowns.* (Young Tr. 320.)[3] Dixon performed *Ah Mes Amis* and *Make Them Hear You*, the latter of which came from the repertoire he performed in the Broadway musical *Ragtime* and had been specifically arranged for him by *Ragtime*'s author. (Dixon Tr. 383.) Cook sang *O'Lessate di Piagermi*, (Pls.' Ex. 35; Dixon Tr. 490.) All three tenors

---

[3] Young recalled singing *Twisted* (*Id.*) However, that song does not appear on the proposed showcase program. (Pls.' Ex. 35.)

sang *La Donna e Mobile*, a universal piece standard in each tenor's repertoire.  (Dixon Tr. 387.)  These songs from the defendants' repertoire were ultimately included in the thirty-two songs that were performed in the Show and listed in Caffey's subsequent copyright application.  (Pls.' Ex. 1.)  Caffey, however, insists that the showcase was not intended to be a precursor or version of the Show.  (Caffey Decl. ¶ 19).

Following the showcase, Caffey, Cook, Dixon and Young engaged in a series of workshops to develop the Show.  (Cook Tr. 151, 158.)  Cook testified that the workshop was intended, in part, to demonstrate to Caffey which songs they wanted to include in the Show.  (*Id.* at 158.)  Over the course of three years, defendants and Caffey collaborated together in selecting the solo pieces, group numbers and some of the spoken dialogue to segue the songs.  (Dixon Decl. ¶ 5; Dixon Tr. 486; Young Decl. ¶¶ 5-6; Defs.' Proposed Findings of Fact and Conclusions of Law ¶ 6.)  The primary factors in determining the selection and ordering of the songs were (1) musicality; (2) familiarity and commercial popularity with the general public; and (3) the physical demands of performance.  (Caffey Decl. ¶¶ 9, 11; Young Tr. 322.)  Caffey felt that it was important to maintain "an 'arc,' i.e., a pattern that resonates with and moves the audience in the most effective manner."  (Caffey Decl. ¶ 11.)  Dixon stated that "as far as crafting this concert from beginning to end, the arc, it had to [as] with, can you physically sing the repertoire, what do you feel comfortable singing, and number three, can you maintain the standard over four concerts in one week."  (Dixon Tr. 486.)

The Show evolved into a collection of solos, group numbers and medleys linked together with a minimal amount of bridge dialogue.  A script for the show prepared by Caffey identified thirty-two songs to be performed in the following order:

Act I:  *La Donna E Mobile*
       *Nessun Dorma*
       *Ah! Mes Amis, Pour Mon Amie*
       *O Cessate di Piagarmi*
       *Have You Heard About the Baby/Glory to the Newborn King*
       *Let the Good Times Roll*
       *Try to Remember*
       *Not While I'm Around*
       *Make Them Hear You*
       *What Kind of Fool Am I?*
       *Send in the Clowns*
       *I'm a Brass Band*
       *Minnie the Moocher*

Act II: *You Gotta be a Rug Cutter*
       *It Don't Mean a Thing*
       *I Let a Song Go Out of My Heart*
       *Drop Me Off in Harlem*
       *I'm Beginning to See the Light*
       *Take the "A" Train*
       *Today I Sing the Blues*
       *Twisted*
       *A Song For You*
       *Soul Medley (Love Train/Oh Girl/Betcha By Golly Wow/Midnight Train to Georgia)*
       *Were You There*
       *America the Beautiful*
       *Gospel Medley (Let the Praise Begin/Just Come/It's My Time to be Blessed)*

With respect to the first four classical pieces – *La Donna E Mobile*, *Nessun Dorma*, *Ah! Mes Ami* and *O Cessate di Piagarmi* – Dixon testified that he and Young "felt that *Nessun Dorma* should lead after *La Donna E Mobile* because we wanted to establish very quickly with anybody in the room that the Italian aria, which is well known throughout the world" would establish "the legitimacy of what it is [the audience] are about to experience for the rest of the night."  (Dixon Tr. 488.)  Caffey placed *O Cessate di Piagarmi*, which was a solo piece performed by Cook, at the end of the four songs because he believed that Cook did not have a great deal of classical training and the song

was relatively familiar and easy to sing. (Caffey Decl. ¶ 9; Dixon Tr. 489.) While Cook had suggested two other songs – *Faith* and *Somewhere* – to Caffey, those songs were ultimately not included in the Show. (Cook Tr. 207.) Defendants admitted that the Soul Medley which consisted of four songs – *Love Train*, *Oh Girl*, *Betcha By Golly Wow* and *Midnight Train to Georgia* – was Caffey's idea. (Dixon Tr. 499.)

It is undoubtedly true that defendants actively participated in the selection and sequencing of the songs that comprised the Show. The Show was a collaborative undertaking that included primarily Caffey and the three tenors, but included musical arrangers and directors, set, costume and lighting designers. (Caffey Decl. ¶ 19; Caffey Tr. 288-89.) It is also true that approximately seven of the songs were taken directly from the established repertoires of the defendants. However, a number of other songs from defendants' repertoires were suggested but ultimately rejected by Caffey. (Caffey Decl. ¶ 20.) Thus, it was Caffey who had the decision making authority on what went in the Show and what did not. As Cook conceded, "Caffey arranged the show" (Cook Tr. 486) and had the "final decision" as to what songs were to be in the Show and in what sequence (*Id.* at 155-156, 206-207).

The bridge dialogue for the show was minimal, amounting to about a page and one-half of text, and was also a collaborative effort. Caffey, however, actually penned the text and had the final say as to what spoken words would be incorporated into the Show. (Cook Tr. 208; Caffey Decl. ¶ 22.)

At the time of their involvement in the workshops, defendants never asked Caffey to be included as joint authors. This was based on their belief that there was nothing copyrightable in the performance of other people's songs. (Cook Tr. 198) ("So I didn't

think there was going to be a copyright.  I wasn't asked or told."); Young Tr. 347; Dixon Tr. 442.)

III.     The Performance Contracts

In 2000, Caffey, Klausner, Brenda Trawick and Euripides Camarano formed the Three Mo' Partnership to produce the Show.  (Caffey Decl. ¶ 33.)  In an agreement executed on June 20, 2000, Caffey identified himself as "the conceiver and author" of the Show and licensed his rights to produce and present the Show to the Three Mo' Partnership.  The defendants were not parties to this agreement and there is no evidence that they received copies of it.  (Pls.' Ex. 16.)

In 2001, the Three Mo' Partnership and defendants, each of whom was represented by counsel, entered into negotiations to perform in the Show.  (Cook Tr. 145; Young Tr. 336; Caffey Decl. ¶ 34.)  In April of 2001, each of the defendants executed a letter memorandum confirming the terms of their engagement (the "Engagement Agreements").  (*See* Pls.' Exs. 6A, 6B and 6C.)  By their terms, the Engagement Agreements expired in 2002.  (*Id*.)  The Engagement Agreements stated that the Show was "conceived and directed by Marion J. Caffey and produced by the [Three Mo'] Partnership."  (*Id*.)  There is no reference to Caffey as the "author" of the Show. However, the Agreements do not give defendants any rights to their creative contributions.  To the contrary, they provide that:

> Producer shall be the sole and exclusive owner of all results and proceeds of Artist's performance services hereunder (excluding active characterizations of material which have previously been a part of Artist's standard repertoire, and, for the avoidance of doubt, vocal arrangements heretofore prepared by Artist…) as a work-made-for-hire within the meaning of the U.S. copyright law.…

The Engagement Agreements further provided that:

8

Lender and Artist warrant and agree that Artist shall render services as instructed by Producer in all matters, including those involving artistic taste and judgment, whenever and wherever Producer may reasonably require, including, without limitation, for all performances, rehearsals, public appearances and other related commitments scheduled by Producer in connection with the development, production, marketing or performance of the Show or any ancillary or subsidiary exploitation thereof, including without limitation, the PBS Special and the Album.

(Pls.' Exs. 6A, 6B and 6C.)  Cook acknowledged that this provision gave the producer final say on what would be included in the Show.  (Cook Tr. 152.)  Cook also acknowledged that they were obligated to perform in the manner Caffey directed them to perform.  (Cook Tr. 152.)

IV.     Defendants Begin Performing as the Three Mo' Tenors

Between 2001 and 2003, defendants performed the Show approximately 100 times to rave reviews from theater and music critics.  (Cook 143; Pls.' Ex. 11.)  *The Boston Globe* stated that "[t]he 'Three Mo' Tenors' are offering a sensational show, and the next time they come around, people are going to be paying big bucks to hear them in the Fleet Center."  (Pls.' Ex. 11.)  According to that paper's critic, Young was a "magical singer in every idiom and a supreme artist," further remarking that "[i]t is sad that Young has had to wait more than 30 years for the kind of recognition this show will certainly bring him."  (*Id.*)  Similarly, *The Chicago Sun-Times* described Young as "the standout, an extraordinary performer whose extensive credits include appearances with conductors Zubin Mehta, Esa Pekka-Salanon and Simon Rattle in opera repertoire ranging from Schoenberg and Hindemith to John Adams."  (*Id.*)  Dixon and Cook also garnered rave reviews.  Dixon was described as "magnetic" and, according to one critic, Cook "was the most amazing of the three."  (*Id.*)

V.    Caffey's Copyright Registration

One year after performances began, Caffey sought to register a copyright in the Show through his attorneys at the law firm Robinson Brog Leinwand Greene Genovese & Gluck.  (Caffey Decl. ¶ 27.)  Colette Stanford, an attorney at the firm, received the following documents in connection with preparing the copyright application: (1) Caffey's proposed script for the Show; and (2) a "Song/Composer/Publisher List."  (Declaration of Colette Stanford ("Stanford Decl.") ¶ 2.)  Caffey told Stanford that he did not intend to register a copyright in the underlying songs, but that he wished to register a copyright in "the compilation of the songs and the words bridging the songs together."  (Colette Stanford Trial Testimony 37.)

The copyright application originally stated the "Nature of Authorship" as "Compilation and dramatization of music."  (Pls.' Ex. 1.)  However, that description was crossed out and amended to read "Creation of text of dialogue in combination with a compilation of song lyrics."  (*Id.*)  The application further stated that the work was the "[c]reation of text of dialogue in combination with a compilation of song lyrics."  (*Id.*)  The compilation consisted of thirty-two songs sequenced as set forth above.  *(Id.)*  In addition, the deposit material submitted with the application included the script of the entire Show, a one page description of the Show and a "Song/Composer/Publisher List" of every song in the Show.  (Stanford Decl. ¶ 5.)  The U.S. Copyright Office granted the application on June 19, 2002 and issued U.S. Copyright Registration No. PA 1-080-528 to Caffey.  (Pls.' Ex. 1; Caffey Decl. ¶ 27.)

It does not appear that Caffey ever told the defendants that he was registering a copyright claim to any element of the Show. According to Caffey, "it was none of their business." (Caffey Tr. 290; Cook Tr. 176 ("I wasn't asked or told.").) Caffey asserted, however, that each defendant received a script during rehearsals in 1999 which stated at the bottom: "Copyright 1999 by Marion J. Caffey." (Caffey Tr. 290.) The script submitted to the Copyright Office in 2001 does in fact contain this statement. (Pl's. Ex. 2.) Defendants testified, however, that the version they saw during rehearsals did not incorporate any of the information on the lower-right side of the cover page which identifies a licensor and legal counsel as well as the copyright reference. (Dixon Tr. 436; Young Tr. 349.) While plaintiffs attack defendants' credibility on this issue, the Court notes that none of the public promotional material prepared for the Show contains a copyright claim by Caffey. For example, the "Playbill" for the performance at the Cadillac Palace in Chicago sets forth the standard credits for a theatre production but states only the Show was "Conceived and Directed by" Marion J. Caffey. Indeed, the only public claim of a copyright is found on the back cover of the RCA Victor DVD of a 2001 performance at the Hammerstein Ballroom in New York City that had been broadcast live on Channel Thirteen/WNET. (Pls.' Ex. 17.) The DVD lists BMG Entertainment as the copyright proprietor. Caffey was unable to explain this, stating that he had never seen the copyright claim by BMG on the DVD prior to trial. The issue of what copyright claims were made by whom, and when defendants first became aware of plaintiffs' claim is murky; however, the Court concludes that plaintiffs have not establish by a preponderance of the evidence that defendants were made aware of Caffey's claim during rehearsals for the Show.

VI.     The Receivership

In March of 2003 the Three Mo' Partnership experienced severe financial difficulties.  Following a show in Las Vegas, the defendants were told that the partnership was without funds to pay the performers or to produce shows that had already been booked.  (Dixon Tr. 371; Cook Tr. 203.)  Litigation among the partners ensued and the managing partner, Brenda Trawick, was accused of financial wrongdoing.  (Pl's. Ex. 9.) (*BT Productions, Inc. v. Edgework Productions, Inc.*, No. 60393Y02 (N.Y. Sup. Ct).)  On April 30, 2003, the court in that action appointed Albert Sontag as temporary receiver of the partnership assets.  (Klausner Decl. ¶ 24; Pls.' Ex. 9.)  At about the same time, counsel for the defendants advised the partnership that it had breached its contractual obligations to defendants.  (Pl's. Ex. 9 at 2.)

On May 13, 2003, Caffey's attorney, Erach F. Screwvala, wrote a letter to Carol Kirkendall of CD Enterprises, Inc., claiming Caffey's right in "the continued performance of THREE MO' TENORS," including any copyrights or trademarks associated with THREE MO' TENORS.  (Pls.' Ex. 32.)  Robert Cinque, attorney for Cook, Dixon and Young, responded by letter dated May 28, 2003, requesting that Screwvala furnish any documents referring to the basis of Caffey's copyright and trademark claims.  (Pls.' Ex. 33.)  Screwvala declined and responded "[w]e are confident of our client's rights and reiterate our demand of May 13, 2003, that your clients cease and desist all efforts to infringe upon Mr. Caffey's intellectual property rights.  Proceed at your peril."  (Pls.' Ex 34.)

Despite the ongoing litigation among the partners and the threats of litigation with the performers, all parties were interested in reaching a *modus vivendi.*  Accordingly, on

July 3, 2003, the receiver, Albert Sontag (the "Receiver"), executed a settlement agreement (the "July Settlement Agreement") pursuant to which defendants agreed to perform engagements previously booked by the Three Mo' Partnership for July 11-12, 2003, July 26, 2003, July 29-30, 2003, August 4, 2003, August 8, 2003 and August 12, 2003. (Pls.' Ex. 9.) The July Agreement explicitly stated:

> The balance of the guaranteed fee as well as any and all other consideration due for each Receivership Date and Fill In Date, shall be paid to CD Enterprises, Inc. ("CD") on behalf of the Artists. CD shall be responsible for paying out of monies received in connection with the Receivership Dates and Fill In dates the production expenses and the expenses of the Artists, except for the expenses that are the responsibility of the presenter. Notwithstanding the foregoing, unless the Tenors represent to the Receiver in writing that there is no author or director's royalties due to Marion Caffey with respect to a particular Receivership or Fill In Date, any royalties that may be due to Marion Caffey shall be paid by CD to the Receiver, who shall in turn, remit them to Mr. Caffey. A schedule of royalty calculations based on Caffey's contract with the Partnership is annexed hereto as Exhibit "A."

(Pls.' Ex. 10.) Exhibit A, annexed to the July 3, 2003 Agreement, set forth "Marion Caffey Royalty Claims," setting forth an author royalty of $93.75 and director royalty of $46.87 for each of the performances. (Pls.' Ex. 10.)

On September 3, 2003, the Receiver executed another agreement (the "September Settlement Agreement") with defendants to secure their appearances at engagements previously booked by the Three Mo' Partnership for September 18, 2003, September 20, 2003, October 2, 2003, November 8-9, 2003 and November 14-15, 2003. (Pls.' Ex. 10; "Mandelker Decl. ¶ 12.) The September Agreement set forth the same clause contained in the July Agreement, providing for author and director royalties to be paid to Caffey. (Pl's. Ex. 10.)

Defendants admitted that they paid author royalties to Caffey and that there were no instances in which Caffey or the Receiver was advised that no royalties were due.

(Cook Tr. 169, 171; Young Tr. 343.)  Defendants felt that the Receiver was running the Show and twisting their arms to pay royalties to Caffey.  (Dixon Tr. 459.)  Nevertheless, Caffey received royalty payments from July 31, 2003 through December 8, 2003.  (Pls.' Ex. 14.)

VII.   <u>Defendants Continue Performing After the Receivership Dates and the Additional Receivership Dates</u>

    *A.     The In-Concert Performances*

After defendants completed their performances on the dates set forth by the July and September Settlement Agreements, they performed seven "In Concert" shows as Cook, Dixon & Young, which shows were in substance the Show they had performed as the Three Mo' Tenors.  (Cook Tr. 160.)  Specifically, defendants performed in Naples, Florida (December 2, 2003); Chicago, Illinois (December 5, 2003); Phoenix, Arizona (March 31, 2004); Philadelphia, Pennsylvania (May 9, 2004); Naperville, Illinois (September 25, 2004); Memphis, Tennessee (October 2, 2004); and New Orleans, Louisiana (October 4, 2004).  (Pls.' Exs. 4, 5.)  Defendants did not request, and Caffey did not give his permission to defendants to perform the compilation of songs or dialogue that had been used in the Show. (Caffey Decl. ¶ 47.)

For the first six dates, defendants performed the same show with the exception of substituting one aria (*Di Quella Pira* for *Ah! Mes Amis, Pour Mon Ame*) and altering the underlying musical arrangements for certain of the songs for these concerts.  (Dixon Tr. 460-68; Pls.' Exs. 3, 4, 20; Caffey Decl. ¶ 52.)  However, with respect to the New Orleans concert, defendants performed only a 45-50-minute set, the Show normally being two hours and fifteen minutes, and changed the order of the songs that were sung. (Dixon Tr. 468; Cook Decl. ¶ 14.)

The parties agree that defendants grossed the following amounts for these performances:

| | |
|---|---|
| Naples, Florida | $40,000 |
| Chicago, Illinois | $115,000 |
| Phoenix, Arizona | $45,000 |
| Philadelphia, Pennsylvania | $40,000 |
| Naperville, Illinois | $50,000 |
| Memphis, Tennessee | $40,000 |
| New Orleans, Louisiana | $50,000 |

(Pls.' Ex. 5; Defs.' Proposed Findings of Fact and Conclusions of Law ¶ 41; Pls.' Proposed Findings of Fact and Conclusions of Law ¶ 66.) For each performance, defendants paid a 10% booking fee to the William Morris Agency from the gross revenues received from these concerts. (Declaration of Karl Graham ("Graham Decl.") ¶ 5; Cook Tr. 507.) Defendants further paid out 20% of their gross income to their personal manager, CD Enterprises, and 5% of their gross income to Padell Nadell, their business manager. (Graham Decl. ¶ 6.) In addition, defendants paid general overhead costs from December of 2003 through December of 2004 as follows: $1,000.00 for legal fees; $6,408.88 for insurance; $6,000.00 for public relations; $23,391.91 for rehearsals; $3,475.00 for travel; and $10,363.31 for reimbursements to CD Enterprises. (Graham Decl., Ex. A.) During this period there were seven "In Concert" and ten abbreviated "private" performances. Graham attested that "it would be fair to allocate one-seventeenth of the total overhead expenses to each date." (Graham Decl. ¶ 11.) Defendants also paid state, local and federal taxes ranging 30-35% of their net income. (Graham Decl. ¶ 12; Cook Tr. 513.)

With respect to the Naples, Florida performance, defendants paid $14,000.00 in commissions, $3,563.64 in disbursements regarding per diem expenses and other costs,

$3,850.28 in salaries to the musicians and $140.62 as royalty payments to Caffey. (Graham Decl., Ex. A; Cook Tr. 510-11; Pls.' Exs. 14, 36.)

With respect to the Chicago, Illinois performance, defendants paid $40,250.00 in commissions, $1,977.33 in disbursements, $11,279.17 in check disbursements including salaries to musicians and $140.62 in royalties to Caffey. (Graham Decl., Ex. A; Cook Tr. 510-11; Pls.' Exs. 14 and 37.)

With respect to the Phoenix, Arizona performance, defendants paid $15,750.00 in commissions, $2,502.18 in disbursements, $4,329.29 in hotel expenses and $4,831.60 in check disbursements. (Graham Decl., Ex. A.)

With respect to the Philadelphia, Pennsylvania performance, defendants paid $13,825.00 in commissions, $4,034.45 in disbursements, $5,489.28 in check disbursements. (Graham Decl., Ex. A.)

With respect to the Naperville, Florida, Memphis, Tennessee and New Orleans, Louisiana performances, defendants paid a total of $42,500.00 in commissions, $7,601.41 in disbursements and $25,318.66 in check disbursements. (Graham Decl., Ex. A.)

B.      The Private Performances

On June 10, 2004, defendants performed at the private NAACP Armed Services and Veteran Affairs Awards Dinner in Arlington, Virginia. (Pls.' Ex. 5.) Defendants performed for an hour and a half singing some of the classical pieces and the soul medley from the Show. (Dixon Tr. 471.) Dixon testified that where the event was private, then the concert would have to change to accommodate the time limits. (Dixon Tr. 476.)

On June 26, 2004, defendants performed for fifteen minutes at the private Family Expo Mega Fest's Phenomenal Woman Awards Gala Ceremony in Atlanta, Georgia

(Pls.' Ex. 5), but did not perform the same four classical pieces from the Show.  (Dixon
Tr. 422.)  Dixon testified that because their performance was in connection with a church
religious service, defendants opened with a classical number but added other religious
songs such as *Give Me a Clean Heart, Oh God*.  (Dixon Tr. 472.)

On June 27, 2004, defendants performed at the Rainbow PUSH Coalition Annual
Conference in Chicago, Illinois.  (Pls.' Ex. 5.)  Defendants sang the four classical pieces
from the Show, and Dixon sang *Make Them Hear You*.  (Dixon Tr. 474.)  Dixon could
not recall what Cook or Young sang.  (Dixon Tr. 474-75.)

On July 6, 2004, defendants performed at the Zeta Phi Beta Sorority Event in Los
Angeles, California during an hour and a half set.  (Pls.' Ex. 5; Dixon Tr. 476.)  Dixon
testified that he sang *Make Them Hear You* as well as the soul medley.  (Dixon Tr. 478.)
Dixon testified that he could not remember whether the four classical pieces had been
performed that night.  (Dixon Tr. 475.)

On July 24, 2004, defendants performed at the Millennium Park Inaugural in
Chicago, Illinois.  (Pls.' Ex. 5.)  Dixon admitted that they sang *La Donna E Mobile*, *Ah!
Mes Amis, Pour Mon Ami*, *I'm a Brass Band*, *What Kind of Fool am I*, *Send in the
Clowns* and *America the Beautiful*.  (Dixon Tr. 479-80.)

On September 24, 2004, defendants performed at the Perfecting Church Gala in
Detroit, Michigan.  (Pls.' Ex. 5.)  Defendants did not perform *La Donna E Mobile*, but
rather inserted *Di Quella Pira*.  (Dixon Tr. 480-81.)  Dixon testified that they were
moving in a different direction with the concert, and adding *Give Me a Clean Heart Oh
God*.  (Dixon Tr. 480.)

**CONCLUSIONS OF LAW**

I.     Standard for Copyright Infringement

The Copyright Act of 1976 (the "Act") extends copyright protection to "original works of authorship fixed in any tangible medium of expression" including "musical works, including any accompanying words."  17 U.S.C. § 102(a).  Along with other rights, the owner of a copyright has the "exclusive" right to "perform the copyrighted work publicly."  17 U.S.C. § 106(4).  Section 501 of the Act provides the owner of a copyright with a cause of action for infringement against "[a]nyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118."  17 U.S.C. § 501(a).

In asserting a claim of copyright infringement, the plaintiff must show (i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work." *Jorgenson v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (internal citations omitted).  A certificate of copyright registration constitutes *prima facie* evidence of the validity of the claimed copyright, as well as the originality of a work.  17 U.S.C. § 410(c); *Boisson v. Banian, Ltd.*, 273 F.3d 262, 268 (2d Cir. 2001).  Plaintiffs have sought copyright protection for the particular selection and arrangement of songs and the dialogue embodied in the Show.  (Pls.' Proposed Findings of Fact and Conclusions of Law ¶ 4.)  In support of this claim, plaintiffs have presented a copy of the certificate registration issued on June 19, 2002 from the U.S. Copyright Office for the "[c]reation of text of dialogue in combination with a compilation of song lyrics."  (Pls.' Ex. 1.)

Accordingly, plaintiffs have met their *prima facie* burden of establishing the validity and originality of the claimed copyright in the Show.

II.    Validity

The presumption of validity may be rebutted through a showing of non-originality or fraud.  *Lennon v. Seaman*, 84 F. Supp. 2d 522, 525 (S.D.N.Y. 2000); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 13.01[A] at 13-7 (2004) (hereinafter "Nimmer").  In this instance, defendants contend that (1) the Show is a <u>derivative</u> work comprised of pre-existing copyrighted song, (2) plaintiffs never obtained a consent from any of the copyright proprietors of the songs, and (3) since the copyrighted songs "pervade" plaintiffs' work, Caffey's copyright is invalid.  (Defs.' Proposed Findings of Fact and Conclusions of Law ¶¶ 6-15.)  Plaintiffs counter that the Show is a <u>compilation</u> in which copyright protection is sought extends only as to the particular selection and ordering of the songs and not to the underlying songs themselves, and, therefore, does not depend for its validity on the consent of the authors of the underlying works.  (Pls.' Proposed Findings of Fact and Conclusions of Law ¶¶ 1-6.)

While there is "necessarily some overlapping" between compilations and derivative works, they basically represent "different concepts."  H.R. Rep. No. 94-1476 at 57-58 (1976).  Specifically, the Act defines a "compilation" as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship."  17 U.S.C. § 101 (2000).  The term "compilation" includes "collective work," which is "a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent

works in themselves, are assembled into a collective whole." *Id*. By contrast, a derivative work is "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which *a work may be recast, transformed, or adapted*." *Id*. (emphasis added).

Regardless of whether the work is classified as a compilation or derivative work, the copyright "extends only to the material contributed by the author of such work, as distinguished from preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." *Id*. at § 103(a). Moreover, the copyright "is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material." *Id*. In this context, Section 103 "prevents an infringer from benefiting, through copyright protection, from committing an unlawful act, but preserves protection for those parts of the work that do not employ the preexisting work." H.R. Rep. 94-1476, at 57. For example, the House Report explains:

> [A]n unauthorized translation of a novel could not be copyrighted at all, but the owner of a copyright in an anthology of poetry could sue someone who infringed the whole anthology, *even though the infringer proves that publication of one of the poems was unauthorized*.

*Id*. (emphasis added).

However, a "derivative work is, by definition, bound to be very similar to the original." *Pickett v. Prince*, 207 F.3d 402, 406 (7th Cir. 2000); *Nimmer* § 3.01 at 3-4 ("A work is not derivative unless it has *substantially* copied from a prior work."). As such, "[c]oncentrating the right to make derivative works in the owner of the original work prevents what might otherwise be an endless series of infringement suits posing insoluble

difficulties of proof," *Nimmer* § 3.01 at 3-4, to the extent that the Act generally "den[ies]" copyright protection to derivative works in which the pre-existing work tends to pervade the entire derivative work." *Nimmer* § 3.06 at 34-25. In those instances, "the copyright claimant of the derivative work must have the consent of the holder of the copyright in the pre-existing work for the creation of the derivative work." *Fred Riley Home Building Corp. v. Cosgrove*, 864 F. Supp. 1034, 1037 (D. Kan. 1994) (citing *Gracen v. Bradford Exchange,* 698 F.2d 300 (7th Cir. 1983)). [4]

By contrast, a copyright in a compilation arises from "the selection and arrangement of a number of pre-existing works, and not *per se* from the reproduction of any particular prior work." *Nimmer* §3.06 at 3-34.24. Specifically, a "collective work will qualify for copyright by reason of the original effort expended in the process of compilation, even if no new matter is added." *Id.* § 3.03 at 3-11. So long as the compiler of material previously copyrighted by others has exercised "some minimal level of creativity" in the selection process, he is entitled to a copyright in that selection. *Silverstein v. Penguin Putnam, Inc*., 368 F.3d 77, 83 (2d Cir. 2004) (citing *Feist Publications v. Rural Telephone Service Co*., 499 U.S. 340, 348 (1991)).

The record indicates that Caffey selected and ordered the thirty-two songs from a universe of possible musical compositions based on his sense of musicality, the

---

[4] Throughout this litigation, defendants have persistently relied on the Second Circuit's opinion in *Eden Toys, Inc. v. Floralee Undergarment Co., Inc*., 697 F.2d 27, 34 n.6 (2d Cir. 1982). In *Eden Toys*, the holder of a license to manufacture and sell products based on books regarding the popular character "Paddington Bear," sued a clothing manufacturer for copyright infringement. The Second Circuit stated that:

> [I]f Eden [the licensee] did not have Paddington's [the licensor] consent to produce a derivative work based on Paddington's copyrighted illustrations, its derivative copyrights would be invalid, since the pre-existing illustrations used without permission would "tend[] to pervade the entire derivative work."

*Id*. at 34 n.6 (citing *Nimmer* § 3.06, at 3-21; H.R. Rep. No. 94-1476, at 57-58). *Eden Toys* is distinguishable from the case at bar, since, as discussed, plaintiff's copyright arises from the Show as a compilation, and not as a derivative work of any particular musical composition contained therein. While it is true that preexisting songs are incorporated throughout the Show, no particular song "pervades" the Show so as to transform the Show into a derivative work of that song.

audience's familiarity with the songs, the physical demands of performance, and the suggestions of the defendants based on their own repertoire. (Caffey Decl. ¶¶ 9, 11; Cook Tr.) The particular arrangement of the Show arose from his general vision of creating a show in which three African-American tenors could sing a variety of musical genres without merely sounding like opera singers. (Caffey Decl. ¶ 4.) Consistent with his claim of ownership in the particular selection and ordering of the songs, Caffey also claimed a copyright in the "[c]reation of text of dialogue in combination with a compilation of song lyrics." (Pls.' Ex. 2.) No aspect of the copyright purports to claim rights in the underlying songs themselves.

Accordingly, the Court finds that the Show qualifies for copyright protection as an original compilation – specifically, a collective work – incorporating the selection and ordering of preexisting musical compositions, notwithstanding plaintiffs' failure to obtain prior authorization for the inclusion of those compositions in the Show.[5] The Show is not a derivative work that recasts, transforms of adapts these compositions; indeed, the songs were merely chosen, listed and performed in a particular order. Moreover, the preponderance of the evidence establishes that Caffey's selection and arrangement of songs and dialogue entail the "minimal degree of creativity" necessary to merit copyright protection based. *Silverstein*, 368 F.3d at 83 ("And if the selection process imbues a compilation with the requisite creative spark, the compilation may be protected so long as there are indicia that principles of selection (other than all-inclusiveness) have been employed.")

---

[5] There is no evidence that any performance was staged, or recording of the Show made without composer royalties being made to the songs' authors. (Cook Tr. 199.)

III.     Joint Authorship

Defendants nevertheless contend that if the Show is copyrightable, they are joint authors and joint owners of any copyright, and, therefore, cannot be liable to a co-owner for infringement.  (Defs.' Proposed Findings of Fact and Conclusions of Law  ¶¶ 16-19.) Plaintiffs maintain that defendants have failed to establish that they made independently copyrightable contributions to the Show, or that the parties shared the requisite intent to be considered joint authors.   (Pls.' Proposed Findings of Fact and Conclusions of Law ¶¶ 7-14.)

The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of the unitary whole."   17 U.S.C. § 101.  The "touchstone of the statutory definition 'is the intention at the time the writing is done that the parts be absorbed or combined into an integrated unit.'"   *Thomson v. Larson*, 147 F.3d 195, 199 (2d Cir. 1998) (quoting H.R. Rep. No. 94-1476 at 120-21).   If considered "joint authors" alongside Caffey, defendants would then be entitled to "equal undivided interests in the whole work" – i.e., "the right to use or to license the work as he or she wishes, subject only to the obligation to account to the other joint owner for any profits that are made." *Thomson*, 147 F.3d at 199.

In the seminal case, *Childress v. Taylor*, which articulates the parameters of joint authorship, the Second Circuit imposed a "more stringent inquiry" than the statutory requirements of the Act, based in part on its concern that:

> [A]n inquiry so limited would extend joint author status to many persons who are not likely to have been within the contemplation of Congress.   For example, a

> writer frequently works with an editor who makes numerous useful revisions to the first draft, some of which will consist of additions of copyrightable expressions. Both intend their contributions to be merged into inseparable parts of the unitary whole, yet very few editors and even fewer writers would expect the editor to be accorded the status of joint author, enjoying an undivided half interest in the copyright of the unpublished work.

*Childress v. Taylor*, 945 F.2d 500, 507 (2d Cir. 1991). The Second Circuit thus sought to strike a balance between ensuring that joint authors are afforded due credit for their creative contributions and protecting sole authors from being divested of exclusive authorship simply by accepting assistance, however minimal. *Id.* at 507-08; *see also Erickson v. Trinity Theatre, Inc.*, 13 F.3d 1061, 1071 (7th Cir. 1994) ("The copyrightability standard allows contributors to avoid post-contribution disputes concerning authorship, and to protect themselves by contract if it appears that they would not enjoy the benefits accorded to authors of joint works under the Act.") As such, a "co-authorship claimant bears the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." *Thomson*, 147 F.3d at 200.

A.      *Independently Copyrightable Contributions*

Cook, Dixon, Young and Caffey participated in a series of workshops over a three-year period to develop the Show. (Cook Tr. 151, 158; Dixon Decl. ¶ 5; Dixon Tr. 486; Young Decl. ¶¶ 5-6.) During these workshops, defendants presented portions of their individual repertoires, some of which were incorporated into the Show. Defendant's also participated in arranging the Show according to the physical demands on their voices. (Young Tr. 325-26; Dixon Tr. 486; Cook Tr.140, 156.) With respect to the bridge dialogues, Cook contributed the words "In my mother's words: 'The Voice that didn't change'" while Young contributed the definition for counter-tenor specific to

Cook's voice.  (Cook Decl. ¶ 8; Young Decl. ¶ 7.)  While Caffey made the final decision as to what songs went into the Show and in what order, he candidly conceded the collaborative contributions of the defendants.  (Caffey Decl. ¶ 20.)  And while defendants conceded that Caffey had the final say, they also detailed the creative contributions they made to the Show.  (Young Tr. 325-28; Cook Tr. 194-95; Dixon Tr. 482-502.)

Having evaluated the testimony of all the parties, the Court finds that defendants made significant copyrightable contributions to the Show.

B.    *Mutual Intent*

The requirement of "mutual intent" means that the parties must "entertain in their minds the concept of joint authorship."  *Thomson*, 147 F.3d at 201 (internal citations omitted).  Mutual intent serves to "recognize[] that, since co-authors are afforded equal rights in the co-authored work, the equal sharing of rights should be reserved for relationships in which all participants fully intend to be joint authors."  *Id*.  Yet the Second Circuit has declined to define explicitly what sorts of proof are necessary to show joint intent, perhaps because the test of "co-authorship intent will vary depending on the specific factual circumstances."  *See Thomson*, 147 F.2d at 201 n.16.  However, as *Thomson* makes clear, that joint authorship will not turn solely on "the parties' own words or professed state of mind," but on "factual indicia of ownership and authorship, such as how a collaborator regarded herself in relation to the work in terms of billing and credit, decisionmaking, and the right to enter contracts."  *Id*. (citing *Childress*, 945 F.2d at 508-09).

*1.      Decisionmaking Authority*

The scope and nature of a contributor's "decisionmaking authority over what changes are made and what is included in a work" are important indicators of joint authorship. *Thomson*, 147 F.3d 202-03. As noted, Caffey possessed, and at times exercised, his right to make final decisions as to the ordering of songs and phrasing of the bridge dialogue. (Caffey Tr. 290; Cook Tr. 156, 183-84, 187, 207-08.) The workshops were designed to allow defendants to demonstrate to Caffey which songs they wanted to include in the Show. (Cook Tr. 158.) To be sure, defendants had the "right" or absolute "privilege" to make suggestions to the Show, particularly where the musical compositions posed physical demands that were too exacting on their voices. (Young Tr. 325-26; Dixon Tr. 499.) But while defendants go to great lengths to attack Caffey's ability to dictate the precise songs to be performed, whether Caffey always exercised the right to absolute creative control is irrelevant to whether, in the first instance, he had the authority to do so.

Furthermore, the June 20, 2000 Agreement between the Three Mo' Partnership and Caffey addressed Caffey as the "conceiver and author" of the Show and enabled Caffey to license his right to present the Show to the Three Mo' Partnership. (Pls.' Ex. 16); *see Thomson*, 147 F.3d at 204 ("[T]he parties' agreements with outsiders … can provide insight into co-authorship intent …."). Similarly, the Engagement Agreements, which were executed by defendants represented by counsel, explicitly recognized Caffey as the conceiver of the Show. (Pls.' Exs. 6A, 6B and 6C); *see Thomson*, 147 F.3d at 204 ("The parties' written agreements with each other can constitute evidence of whether the

parties considered themselves to be co-authors") (internal citations omitted). These Agreements also provided defendants "shall render services as instructed by [the Three Mo' Partnership] of which Caffey was a member. (Pls'. Exs. 6A, 6B and 6C.) Defendants acknowledged that this clause empowered the producer (and therefore, Caffey) to exercise the final decision making authority as to what would be included in the Show and the manner in which defendants would perform. (Cook Tr. 152, 156, 158-59, 206-08.) Accordingly, the Court finds that Caffey had the final decision making authority with respect to the creative control of the Show.

### 2. Billing

The manner in which the parties "bill or credit" themselves is "a window [into] the mind of the party who is responsible for giving the billing or the credit." *Thomson*, 147 F.3d at 203 (internal quotations omitted). An author's attribution of the work to himself alone "'is persuasive proof … that [he] intended this particular piece to represent [his] own individual authorship' and is 'prima facie proof that [the] work was not intended to be joint.'" *Id*. (quoting *Weissman v. Freeman*, 868 F.2d 1313, 1320 (2d Cir. 1989)). The numerous playbills accompanying defendants' performances as the Three Mo' Tenors prominently identify the Show as being "Conceived and Directed by Marion J. Caffey." (Pls.' Ex. 12.) Interestingly, the playbills do not refer to Caffey as the author; however, they make absolutely no mention of defendants' involvement in creating, writing or authoring the Show in any manner. (*Id*.) Defendants failed to produce any evidence indicating that they objected to the ways in which the parties were billed and credited. Accordingly, the Court further finds that the manner in which Caffey listed

himself as the conceiver of the Show supports the view that he regarded himself as the sole author." *Thomson*, 147 F.3d at 204.

   3.     *Written Agreements With The Receiver*

As noted earlier, the parties' written agreements with third parties may provide insight into co-authorship intent – albeit to a lesser degree than agreements between the parties themselves. *Thomson*, 147 F.3d at 204. In this instance, the July and September Settlement Agreements between defendants and the Receiver provided that they would pay author royalties to Caffey based on their performances of the Show. (Pls.' Ex. 10.) Exhibit A, which is annexed to the July 3 Settlement Agreement, sets forth "Marion Caffey Royalty Claims," setting forth an author royalty of $93.75 and director royalty of $46.87 for each of the performances. (Pls.' Ex. 10.) The September Settlement Agreement reconfirms defendants' obligation to pay author royalties to Caffey. (Pls.' Ex. 10.)

Defendants concede that they paid author royalties to Caffey and that they never advised either Caffey or the Receiver that no royalties were due. (Cook Tr. 169, 171; Young Tr. 343.) Despite defendants' argument that the Receiver forced them to pay royalties (*see* Dixon Tr. 459), the fact of the matter is that they contracted to pay Caffey royalties, never objected to paying royalties in any meaningful way and did pay such royalties to Caffey from July 31, 2003 through December 8, 2003 (Pls.' Ex. 14). Such evidence is highly probative of Caffey's intent to regard himself as the sole author of the Show, as well as defendants' acknowledgement of that view.

*4.* *Conclusion*

Based on the evidence in the record, the Court finds by a preponderance of evidence that the parties – and in particular, Caffey – lacked the requisite intent to be joint authors at the time the Show was created. The decisionmaking authority wielded by Caffey, the written agreements between the parties explicitly acknowledging Caffey as the conceiver of the show. The written agreements between defendants and the Receiver providing for author royalties payable to Caffey, and defendants' actual payment of author royalties overwhelmingly support the view that Caffey did not intend to share authorship of the Show with defendants. Moreover, defendants themselves disavowed their intention to claim ownership in the Show since they believed, erroneously as it turns out, that the Show did not merit copyright protection. (Cook Tr. 176; Young Tr. 347; Dixon Tr. 442.) Accordingly, the Court finds that defendants have failed to sustain their joint authorship defense.

IV. <u>Infringement</u>

Since plaintiffs have established the validity of Caffey's copyright in the Show, they must now satisfy the second element of an infringement claim – e.g., that defendants engaged in the "unauthorized copying" of the Show. *Jorgensen*, 351 F.3d at 51. Specifically, "plaintiff must first 'show that his work was actually copied'; second, he must establish 'substantial similarity' or that 'the copying amounts to an improper or unlawful appropriation,' i.e., (i) that it was protected expression in the earlier work that was copied and (ii) that the amount that was copied is 'more than de minimis.'" *Tufkenian Import/Export Ventures Inc. v. Einstein Moomjy, Inc*., 338 F.3d 127, 131 (2d

Cir. 2003) (quoting *Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.*, 150 F.3d 132, 137-38 (2d Cir. 1998)). Plaintiffs have identified seven in-concert shows and seven private performances which they claim infringe on their copyright. (Pls.' Proposed Findings of Fact and Conclusions of Law ¶ 16.)

A.  *The In-Concert Shows*

Defendants concede that while appearing as Cook, Dixon & Young – and not as the Three Mo' Tenors – they essentially performed the Show in terms of song selection, ordering and dialogue at the following concerts: Naples, Florida (December 2, 2003); Chicago, Illinois (December 5, 2003); Phoenix, Arizona (March 31, 2004); Philadelphia, Pennsylvania (May 9, 2004); Naperville, Illinois (September 25, 2004); and Memphis, Tennessee (October 2, 2004). (Dixon Tr. 460-68; Pls.' Exs. 3, 4 and 20; Caffey Decl. ¶ 20.) While defendants maintain that the shows were different insofar as they substituted one aria and altered some of the underlying musical arrangements, the selection and ordering of the shows were otherwise held intact. Accordingly, the Court finds that plaintiffs have met their burden in showing copyright infringement with respect to these six shows.[6] Plaintiffs have not, however, satisfied their burden in proving copyright

---

[6] Defendants argue that Caffey granted a nonexclusive license to perform the Show or otherwise waived his copyright claims with respect to the Naples, Florida and Chicago, Illinois performances by virtue of accepting royalties for those performances. (Defs.' Proposed Findings of Fact and Conclusions of Law ¶¶ 24-25.) It is true that a "copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement." *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998). However, the burden of proving the existence of a license rests with the putative licensees – here, defendants. *See Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995). Since it is undisputed that any license to perform the Show expired with the Receiver Dates (*see* Pls.' Exs. 9 and 10), the mere fact that Caffey erroneously accepted royalties on behalf of these performances is insufficient to establish that he either granted or reconfirmed a nonexclusive license to defendants to perform the Show or otherwise waived his copyright claim. *See Kamakazi Music Corp. v. Robbins Music Corp.*, 522 F. Supp. 125, 135 (S.D.N.Y. 1981) (adopting arbitrator's finding that acceptance of royalty did not effect confirmation of license and therefore waiver of infringement claim); *Major-League Baseball Promotion Corp. v. Colour-Tex, Inc.*, 729 F. Supp. 1035, 1044 (D.N.J. 1990) (acceptance of royalties did not establish authorization of defendants' infringing activities); *CBS Broadcasting v. Primetime 24 Joint Venture*, 48 F.

infringement with respect to the New Orleans, Louisiana (October 4, 2004) concert. Defendants testified that in New Orleans they did not perform the two hour and fifteen minute Show, and sang only a fifty minute set that limited the selection and changed the ordering of the songs. Nor is there any evidence that Caffey's dialogue was employed in New Orleans. (Dixon Tr. 468; Cook Decl. ¶ 14.) Plaintiffs' copyright is a limited one and cannot be read to preclude the singing of traditional songs, many of which had been performed by defendants in the past, simply because they had been selected by Caffey for the Show.

With respect to the six infringing in-concert shows, defendants assert the defense of *de minimis non curat lex*. (Defs.' Proposed Conclusions of Law ¶¶ 20-22.) This doctrine insulates infringers who "cause insignificant violations of the rights of others." *Ringgold v. Black Entertainment Television*, 126 F.3d 70, 74 (2d Cir. 1997). This situation does not present itself in the present case where defendants wholly appropriated and incorporated plaintiffs' protected compilation in performing the in-concert shows with virtually the same ordering and selection of songs and bridge dialogue. It is true that plaintiffs' compilation copyright may be considered "thin" and of limited creativity; any number of songs in various orders might do. However, defendants' infringement of the copyrighted element of the Show was not trivial even if the copyright itself was.

B.    *The Private Performance Shows*

With respect to the private performances, plaintiffs failed to adduce sufficient evidence indicating substantial similarity between these performances and the protected selection and ordering of the songs of the Show. *Tufkenian Import/Export Ventures Inc.*,

---

Supp. 2d 1342, 1360 (S.D. Fla. 1998) (the "mere receipt of monthly benefits is far from the type of clear, decisive, and unequivocal conduct that is necessary to find an intent to waiver a legal right.).

338 F.3d at 131.  To the contrary, defendants testified that the performances changed in response to time limits or the nature of the event.  (Dixon Tr. 68-82.)  In addition to such infirmities in plaintiffs' case, the record is bereft of any evidence regarding the order and placement of the songs in these shows.  At best, plaintiffs presented evidence that defendants, at times, performed some of the classical compositions incorporated in the Show, as well as other assorted songs such as *Make Them Hear You* and *I'm a Brass Band* which had been in the individual singer's repertoire long before the Show was created.  (Dixon Tr. 477.)  Plaintiffs have thus failed to show that defendants' performances of any particular song or group of songs in connection with these concerts infringed the limited substance of his copyright claim – the overall selection and ordering of the songs with bridge dialogue embodied in the Show.   Accordingly, the Court finds that plaintiffs have failed to meet their burden of proof with respect to these concerts.

V.      Damages

A copyright owner who succeeds on the merits of his infringement claim is entitled to recover (1) compensatory damages or (2) statutory damages.  17 U.S.C. §§ 504(b) and (c).  Plaintiffs have elected to recover compensatory damages.  (Pls.' Proposed Findings of Fact and Conclusions of Law ¶¶ 21-32.)  Section 504 of the Act sets forth two categories of compensatory damages: infringer's profits that are attributable to the infringement, and the copyright owner's "actual damages."  *On Davis v. Gap, Inc*., 246 F.3d 152, 159 (2d Cir. 2001).  The distinction between these types of damages is important since:

> The award of the infringer's profits examines the facts only from the infringer's point of view.  If the infringer has earned a profit, this award makes him disgorge the profit to insure that he not benefit from his wrongdoing.  The award of the owner's actual damages looks at the facts from the point of view of [the]

> copyright owner; it undertakes to compensate the owner for any harm he suffered
> by reason of the infringer's illegal act.

*Id.*; *see also Hamil America v. GFI, Inc.*, 193 F.3d 92, 103 (2d Cir. 1999) ("These two methods of recovery available under § 504(b) serve two distinct purposes: [d]amages are awarded to compensate the copyright owner for losses from the infringement, and profits are awarded to prevent the infringer from unfairly benefiting from a wrongful act.") (quoting H.R. Rep. No. 94-1476, at 161). Plaintiffs do not bother to seek recovery of their actual losses, presumably because Caffey's author fee was only $93.75 per performance.

A.      *Defendants' Profits*

Section 504 provides that to establish the infringer's profits, the copyright owner must "present proof only of the infringer's gross revenue." 17 U.S.C. § 504(b) (2000). The infringer must then prove his "deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.* As the Second Circuit has stated, the "infringer's profits are calculated as the gross sales of infringing goods minus the costs that the infringer proves are attributable to the production and sale of those goods." *Hamil*, 193 F.3d at 104.

1.      *Plaintiffs' Burden in Showing Gross Revenues*

In discharging their burden, plaintiffs must show "gross revenue reasonably related to the infringement, not unrelated revenues." *On Davis*, 246 F.3d at 160. For instance, the Second Circuit posited:

> Thus, if a publisher published an anthology of poetry which contained a poem
> covered by the plaintiff's copyright, we do not think the plaintiff's statutory
> burden would be discharged by submitting the publisher's gross revenue resulting
> from its publication of hundreds of titles, including trade books, textbooks,
> cookbooks, etc. In our view, the owner's burden would require evidence of the

revenues realized from the sale of the anthology containing the infringing poem. The publisher would then bear the burden of proving its costs attributable to the anthology and the extent to which its profits from the sale of the anthology were attributable to factors other than the infringing poem, including particularly the other poems contained in the volume.

*Id.*

Since plaintiffs have proven that defendants infringed his copyright by incorporating the compilation embodied in the Show in six in-concert performances, plaintiffs must show the gross revenues flowing from those performances. The parties have introduced evidence regarding the gross revenues for each of those performances:

| | |
|---|---|
| Naples, Florida | $  40,000 |
| Chicago, Illinois | $115,000 |
| Phoenix, Arizona | $  45,000 |
| Philadelphia, Pennsylvania | $  40,000 |
| Naperville, Illinois | $  50,000 |
| Memphis, Tennessee | $  40,000 |

(Pls.' Ex. 5; Defs.' Proposed Findings of Fact and Conclusions of Law ¶ 41; Pls.' Proposed Findings of Fact and Conclusions of Law ¶ 66.) Accordingly, plaintiffs have met their burden in showing the total gross revenues associated with the performances of $330,000.

2.      *Defendants' Burden in Offsetting Gross Revenues*

To discharge their burden in showing costs, defendants must demonstrate "with some specificity" "that the expense was incurred in the production of the infringing work. *Nimmer* § 14.03[A] at 14-42; *On Davis*, 246 F.3d at 160. Moreover, "any uncertainty as to profits that is caused by the defendant's failure to keep adequate records of costs will be resolved in favor of the plaintiff." *Yurman Design v. Chaindom Enterprises, Inc.*, No. 99 Civ. 9307 (JFK), 2002 WL 22047843, at *4 (S.D.N.Y. Aug. 29, 2003) (internal citations omitted). In this instance, defendants have adduced evidence of commissions,

disbursements, check disbursements for musician salaries, royalty payments and general overhead costs for these six performances. (*See* Graham Decl., Ex. A.)

(a)    *Commissions, Disbursements and Salaries for each Performance*

Plaintiffs have not contested the specificity of defendants' direct costs. With respect to commissions for each performance, defendants' accountant, Karl Graham, and Cook, who was in charge of expenses, both testified that they paid (1) a 10% booking fee to the William Morris Agency from the gross revenues received; (2) 20% of their gross income to CD Enterprises; and (3) 5% of their gross income to their business manager, Padell Nadell. (Graham Decl. ¶¶ 5, 6; Cook Tr. 507.) Defendants also submitted sufficiently detailed statements for disbursements regarding per diem expenses and other costs, as well as salaries to musicians playing in the performances. (Graham Decl., Ex A.)

For the six infringing shows, defendants have established that their direct costs including commissions, salaries and disbursements totaled $174,995.95. (*Id.*)

(b)    *Overhead Expenses*

With respect to overhead expenses, the Court must first determine "what overhead expense categories (such as rent, business, entertainment, personnel and public relations) are actually implicated by the production of the infringing product." *Hamil Am. Inc.*, 193 F.3d at 106. Once the overhead categories are identified, the infringer must then propose a "fair and acceptable formula" for allotting a share of overhead expenses to the infringed work. *Id.* at 106 (citation omitted). Where the infringement is willful, the Court's analysis must be applied with "particular vigor." *See id.* (citing cases).

To establish willfulness under the Act, "the plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard for, or willful blindness to, the copyright holder's rights." *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.2d 257, 263 (2d Cir. 2005) (internal citations omitted). Indeed, the plaintiff is not required to prove defendants' "actual knowledge that it was infringing" on his copyright. *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1010-11 (2d Cir. 1995). Rather, "[k]nowledge of infringement may be constructive rather than actual; that is, it need not be proven directly but may be inferred from the defendant's conduct." *Id.* (internal citations and quotations omitted).[7]

The Court has found that defendants were not aware of Caffey's claimed copyright at the time of the Show's rehearsals. *See* discussion *supra*. However, on May 13, 2003, Caffey's attorney, Erach F. Screwvala, wrote a letter to defendants' agent, CD Enterprises, Inc., claiming Caffey's right in "the continued performance of THREE MO' TENORS," including any copyrights or trademarks associated with THREE MO' TENORS. (Pls.' Ex. 32.) Robert Cinque, attorney for Cook, Dixon and Young, responded by letter dated May 28, 2003, stating "To the extent that you possess copyright registrations or a trademark application with any supporting documents, kindly furnish them to me. You have my assurances that whatever you provide will be promptly reviewed and a further response given to you. (Pls.' Ex. 33.) Screwvala refused to

---

[7] This test for willfulness has generally been applied to determine whether an enhancement of statutory damages is appropriate under § 504(c). The Court sees no reason not to apply the same standard in the context of calculating net profits under § 504(b). *But see Nimmer* § 14.03(B)(3) at 14-56 n. 81-6 (noting possibility that standards may differ).

provide further information, stating only that "[w]e are confident of our client's rights … Proceed at your peril." (Pls.' Ex 34.)

The question, then, is whether the foregoing exchange of letters establishes willfulness on the part of the defendants. The Court thinks not. At best, the letters reveal that defendants, through their counsel, were aware that Caffey was claiming undefined copyright and trademark interests in the Show. They, or more accurately their counsel, did not demonstrate willful blindness; to the contrary, the letter demonstrates that defendants would have received and considered evidence to support Caffey's claims. In light of what has transpired, it may well have been the better course to ignore Screwala's hostile response and examine the matter further, but this does not mean that defendants conduct was willful or reckless. Moreover, having listened to defendants' testimony, the Court concludes that they in fact believed they had as much right as Caffey to perform the selected songs.[8] As Caffey himself noted, they had "their truth" (Caffey Tr. 289), though in the end their belief was misplaced. Since plaintiffs have failed to establish willful infringement, defendants are entitled to deduct their reasonable overhead expenses in calculating their net profit.

Defendants presented evidence of general overhead expenses from December of 2003 through December of 2004 of $50,639.10 broken down as follows: $1,000.00 for legal fees; $6,408.88 for insurance; $6,000.00 for public relations; $23,391.91 for rehearsals; $3,475.00 for travel; and $10,363.31 for reimbursements to CD Enterprises. (Graham Decl., Ex. A.) During this period, defendants performed 17 concerts and now

---

[8] Plaintiffs make much of a copyright application made by defendants in November 2003 relating to two traditional Christmas carols as evidencing defendants' knowledge that Caffey was able to copyright the selection and sequencing of songs in the Show. The Court declines to draw this inference inasmuch as defendants' application (Pls.' Ex. 42) seeks to copyright a new musical arrangement, not merely a list of songs.

submit that "it would be fair to allocate one-seventeenth of the total overhead expenses to each date." (Graham Decl. ¶ 11.) The Court concludes that there is a sufficient nexus between the foregoing expenses and defendants' infringing performances with the exception of the $23,391.91 spent on rehearsals. Defendants had performed the Show over 100 times. Moreover, in late 2004, defendants were at work on the creation of a new concert containing substantially different material. Therefore, these rehearsal expenses were most likely incurred in preparation of the new concert and will not be deducted. With respect to the remaining overhead expenses of $27,247.19, the Court finds that the pro rata allocation of these expenses over the seventeen shows performed during the period is a fair and acceptable formula, and results in overhead costs for the six infringing performances of $9,616.65. Net income before taxes (revenues less direct and overhead costs) is therefore $145,387.40.

(c)     *Income Taxes*

With respect to defendants' payment of income taxes, a no willful infringer may deduct such costs. *See In Design v. K-Mart Apparel Corp*., 13 F.3d 559, 566-67 (2d Cir. 1994). As the Court therein noted: "[W]hen a claim is made for infringing profits, [t]his means profits actually made. A book profit of a dollar is not a profit actually made when from the dollar the government takes twenty cents as the price for the right to make any profit at all." However, where the infringement was willful, income tax paid from profits is not deductible. *Id*. at 566. Since the Court has found that defendants did not engage in willful infringement, deduction of income taxes is appropriate. Defendants' accountant provided affidavit testimony that their rates of taxation (federal, state and local) ranged

between 30% and 35% of their net income.  The Court accepts the low-end of the range

as a deductible expense in the amount of $43,616.22.

### 3. Total Profits

The Court calculates net profit after deduction of direct and overhead expenses

and taxes of $101,771.18.

### B. Defendants' Burden in Showing Profits Attributable to Other Factors

Section 504(b) permits defendants to prove "the elements of profit attributable to

factors other than the copyrighted work."  17 U.S.C. § 504(b).  Defendants herein

contend that apportionment of the profits is appropriate since Caffey's copyrighted

compilation was a minor factor in the success of the Show.  In situations "where an

infringer's profits are not entirely due to the infringement, and the evidence suggests

some division which may rationally be used as a springboard it is the duty of the [trier-of-

fact] to make some apportionment."  *Orgel v. Clark Boardman Co*., 301 F.2d 119, 121

(2d Cir. 1962); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 886 F.2d 1545, 1549

(9th Cir. 1989) ("[C]ourts cannot be expected to determine with mathematical exactness

an apportionment of profits.") (internal citations omitted).

Apportionment is "not an area susceptible to precise measurement," *Abkco Music

v. Harrisongs Music, Ltd.*, 508 F. Supp. 798, 801 (S.D.N.Y. 1981), particularly where the

analysis does not rest on quantifiable factors such as minutes, pages or lines incorporating

the infringed work,[9] but rather on the incorporation of the infringed work into a new

---

[9] *See, e.g.*, *Orgel*, 301 F.2d at 121 (holding that where the plagiarized material comprised 35% of the work,
and the commercial value of the whole was likely attributable in some part to the remaining 65 percent, 50
percent of the profits were allocated to the infringing material); *Cream Records, Inc. v. Joseph Schlitz
Brewing Co*., 864 F.2d 668, 669-70 (9th Cir. 1989) (reversing and remanding district court's apportionment
of 1% of defendants' profits derived from infringing commercial even though infringement was deemed to
be "minimal"); *Frank Music Corp.*, 886 F.2d at 1549 (9th Cir. 1989) (apportioning 75% of the profits of
one of the acts of a play to plaintiffs where the act was based almost entirely on an earlier musical

presentation. The Second Circuit has considered several factors in apportioning those "elements of profit attributable to factors other than the copyrighted work." *Rogers v. Koons*, 960 F.2d 301, 313 (2d Cir. 1992). Relevant factors include (1) defendants' "own notoriety and ability to command high prices for [their] work," *id.*; *see also Abkco Music*, 508 F. Supp. at 801;[10] (2) the "expert and creative operations involved in the production and direction of the Show," *Sheldon v. Metro-Goldwyn Corp.*, 309 U.S. 390, 406 (1940), *see also Abend v. MCA, Inc.*, 863 F.2d 1465, 1480 (9th Cir. 1988), *aff'd sub. Nom. Stewart v. Abend,* 495 U.S. 207 (1990); (3) the outstanding performances, talent and drawing power of defendants, *Sheldon,* 309 U.S. at 406; and (4) the creativity of defendants in staging the Show, *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1549 (9th Cir. 1989); *Twentieth Century Fox Film Corp. v. Stonesifer*, 140 F.2d 579, 583-84 (9th Cir. 1944) ("It is now settled that where a portion of the profits of an infringing work is attributable to the appropriated work, to avoid an unjust course by giving the originator all profits where the infringer's labor and artistry have also to an extent contributed to the ultimate result").

The Second Circuit has further stated that the extent to which plaintiff "worked over old material" already in the "public demesne" may also "count towards reducing the percentage of the profits recoverable." *Sheldon Music Corp. v. Metro-Goldwyn Corp.*, 106 F.2d 45, 51 (2d Cir. 1939), *aff'd* 309 U.S. 390 (1940). In *Sheldon*, defendants

---

production); *MCA, Inc. v. Wilson*, 677 F.2d 180, 186 (2d Cir. 1981) (apportioning 5% of defendant's profits from musical show to plaintiff where defendant copied plaintiff's song without the lyrics and incorporated the song into the show).

[10] In *Abkco Music*, George Harrison's song "My Sweet Lord" was held to infringe upon an earlier song, "He's So Fine," which was copyrighted by plaintiff Bright Tunes Music Corporation. *Id.* at 799. The court held that three-fourths of "My Sweet Lord's" success was attributable to the plagiarized song, while the remaining one-fourth was derived from other factors, "such as the words and the popularity and stature of George Harrison in this particular field of music." *See id.* at 801-02 (attributing heavy weight to the music itself, because the earlier tune, "He's So Fine," had "already demonstrated its outstanding 'catchiness'" by topping the Billboard charts for five weeks in 1963).

produced a movie that infringed on a play written and copyrighted by plaintiffs.

However, the Second Circuit noted that:

> [T]he plaintiffs worked over old material; the general skeleton was already in the public demesne. A wanton girl kills her lover to free herself for a better match; she is brought to trial for the murder and escapes. Nobody can say how far this basic plot is to be credited with whatever the play contributed to the drawing power of the picture. That consideration must therefore count towards reducing the percentage of profits recoverable.

*Id*. at 51. In light of those considerations, as well as defendants' employment of actors, scenery, directors and producers in adding to the creativity of the film, the Second Circuit awarded plaintiffs 20% of defendants' profits arising from the infringing motion picture. *Id*. at 52; *Stonesifer*, 140 F.2d at 583-84 (awarding 20% of defendants' profits from motion picture that infringed upon plaintiff's copyrighted play).

The Court discerns several "profit-making features, apart from the use of any infringing material," that contributed to the profits of defendants' six in-concert performances. *Sheldon*, 309 U.S. at 406. First, as is evident from the recorded PBS performance, defendants possess tremendous talent. While praising the Show as "sensational," newspaper clippings submitted by plaintiffs indicate that all three defendants were "standout" performers. *Id*. Young was reviewed as "a magical singer in every idiom"; "Cook tore the house down"; and Dixon gave "the most stirring performance." *Id*. In addition, each of defendants entered the Show as performers with impressive resumes including educational pedigrees at the top musical performance schools, Broadway appearances and performances with elite conductors such as Zubin Mehta and Simon Rattle. *Id*. As such, defendants' talent, accolade-laden performances and growing notoriety played a significant role in generating profits for their six performances as Cook, Dixon & Young. *See Sheldon*, 309 U.S. at 406.

Second, plaintiffs admitted that Caffey's concept was intended to piggyback off the idea of "The Three Tenors," popularized by the famous tenors Pavarotti, Domingo and Carreras. (Caffey Decl. ¶ 4.) Certainly, the bankable name and concept of the "Three Mo' Tenors" was, to some extent, already in the "public demesne," as evidenced by the fact that each newspaper article describing the "Three Mo' Tenors" also mentioned "The Three Tenors." (*See* Pls.' Ex. 11 at 1909) ("Who can ignore the success of the Three Tenors concept?") Indeed, the very point of the Show was to offer an African-American alternative to the Three Tenors. (*See* Pls.' Ex. 11 ("Three Mo' Tenors go much farther afield than Domingo or Pavarotti ever did")); *Sheldon Music Corp.*, 106 F.2d at 51. This concept undoubtedly created value in the Show and contributed to the Show's profitability. Caffey, however, does not claim a copyright in the <u>idea</u> of three African-American tenors singing multiple genres; nor does it appear that the idea itself is copyrightable. 17 U.S.C. § 102(B); *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 556 (1985); *Nimmer* § 1.10[B][2]. Moreover, the concept was not entirely novel. Cook frequently sang multiple genres in concert and had even done a show with Caffey in 1991 when he sang classical, jazz, show tunes, pop and gospel. (Dixon Tr. 192; Dixon Decl., Ex. 2.)

Third, a very substantial factor contributing to the Show's profitability was the songs themselves. The show is essentially the performance of other artists' copyrighted works written and made famous by the likes of Verdi, Puccini, Ellington and Calloway. Without the prior works, there is no Show.

Finally, and against this backdrop, the Court must evaluate the nature of plaintiffs' copyright and its contribution to the profits generated by defendants' infringing

performances. The copyright covers three elements: selection, sequencing and bridge dialogue. The defendants contend that the brief lines of dialogue between songs add little value to the Show. Caffey does not seriously dispute this claim, noting only one piece of dialogue that he claims generated significant audience reaction. (Pls.' Proposed Findings of Fact and Conclusions of Law, ¶ 23.) Having reviewed the passages as well as the parties' testimony, and without putting too fine a point on it, the Court finds that the bridge dialogue contributed minimal value to the success of the Show or to the profits generated by the infringing performances.

Defendants also testified that the selection and ordering of the songs had no independent value. (Defs.' Proposed Findings of Fact and Conclusions of Law ¶ 22.) Defendants overstate their case, however, and the Court accepts Caffey's testimony that the selection and ordering of the songs creates an "arc" to the Show. But it is also true that a different ordering of the songs might also result in a successful performance. This is best evidenced by the televised broadcast of a performance on PBS which drastically rearranged the order of the songs with no apparent diminution in effect; indeed it is this telecast that is credited with popularizing the Show. (Pls.' Ex. 11 at.1909; Pls.' Ex. 17). Moreover, the ordering of some of the songs was dictated in part by physical constraints, not creativity. As all parties agreed, the classical numbers put such strain on the performers' voices that they had to be performed first. Indeed the first four classical numbers in the Show were performed in the same order in the 1998 showcase that Caffey admits was "never intended … to be either a precursor or a version of what would eventually become the [Show]. (Caffey Decl. ¶ 19.) Caffey goes on to explain that the purpose of the showcase "[was] to introduce my concept for the Show …" (*Id.*) But the

concept for the Show – three African-American tenors performing a variation of the immensely popular Three Tenors – is not the subject of plaintiffs' copyright, which is limited to the selection and ordering of preexisting copyrighted materials with bridge dialogue. The selection and ordering of the particular songs was not valueless as defendants claim, but the Court concludes that it was of comparable value to the concept for the Show, the defendants' performances and the artistry of the songs themselves.

The apportionment of profits derived from these qualitative factors is an inexact science. And while it would be "certainly unjust" to award plaintiffs all the profits from the infringing shows, it is also true that the Court "must make an award which by no possibility shall be too small." *Sheldon*, 106 F.2d at 51. Accordingly, the share of net profits attributable to the copyrighted element of the Show is fixed at one-third (33.3%) or $33,889.80.

## VI.    Attorney's Fees and Costs

Section 505 of the Act authorizes a court to "award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. In exercising this discretion, courts may consider factors consistent with the Act, such as "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Fogerty v. Fantasy, Inc*., 510 U.S. 517, 534 n.19 (1994) (internal citations omitted). In particular, the Second Circuit has particularly emphasized the consideration of the "objective reasonableness" of the non-prevailing party's position. *Matthew Bender & Co., Inc. v. West Publishing Co*., 240 F.3d 116, 121-22 (2d Cir. 2001); *see also Lotus Development Corp. v. Borland Intern., Inc*., 140 F.3d 70, 75 (1st Cir. 1998) ("Copyright

defendants with strong legal or factual defenses should not be deterred from litigation by the possibility that their refusal to settle an invalid claim will be held against them after they prevail.")  However, even if the losing party's claims were objectively reasonable, the Court may award reasonable attorney's fees since because "bad faith in the conduct of the litigation is a valid ground for an award of fees."  *Matthew Bender & Co*., 240 F.3d at 125.

This action presented serious legal issues regarding the nature and extent of copyrights arising from compilations and collective works, as compared to derivative works.  *See Earth Flag Ltd. v. Alamo Flag Co*., 154 F. Supp. 2d 663, 666 (E.D.N.Y. 2001) (remarking that a court "should not award attorneys' fees where the case is novel or close because such litigation clarifies the boundaries of copyright law").  Defendants asserted defenses and arguments that were not "patently devoid of legal or factual basis" so as to be considered objectively unreasonable.  *Penguin Books, U.S.A., Inc. v. New Christian Church of Full Endeavor, Inc*., No. 96 Civ. 4126 (RWS), 2004 WL 728878, at *3 (S.D.N.Y. Apr. 6, 2004).  While plaintiffs identify other conduct which they claim finds amounts to frivolous or malicious behavior on the part of defendants, the Court finds that defendants did not engage in any conduct that rises to the level of bad faith or egregious litigation.  *C.F. Viacom Int'l Inc. v. Fanzine Int'l, Inc*., No. 98 Civ. 7448 (RCC), 2001 WL 930248, at *6 (S.D.N.Y. Aug. 16, 2001) (awarding attorney's fees where defendant repeatedly ignored plaintiff's discovery requests for nine months, failed to produce a key witness for a deposition and failed to appear for a status conference).  Accordingly, the Court denies plaintiffs' request for attorney's fees.

VII.    Punitive Damages

Finally, plaintiffs seek punitive damages arguing that defendants acted with "malice" and with "personal animosity" towards plaintiffs.  (Pls.' Proposed Findings of Fact and Conclusions of Law ¶ 32.)  It is unclear whether punitive damages may be awarded under the Act where the plaintiff has elected to receive actual damages.  *See Blanch v. Koons*, 329 F. Supp. 2d 568, 569 (S.D.N.Y. 2004) (remarking that "[c]onventional authority holds that punitive damages are unavailable in copyright infringement actions, regardless of whether plaintiff is seeking statutory damages or the alternative of actual damages plus profits.")  Some cases in the Southern District of New York suggest that punitive damages may be awarded where (1) the plaintiff has elected to receive actual damages; and (2) defendants engaged in willful infringement.  *TVT Records v. Island Def Jam Music Group*, 262 F. Supp. 185, 187 (S.D.N.Y. 2003) (concluding that plaintiff's "claims for punitive damages for copyright infringement found to be willful are not precluded as a matter of law and can be presented to the jury.").  Even under this theory, however, the Court has already concluded that defendants did not act willfully in infringing on plaintiffs' copyright.  Accordingly, the Court denies plaintiffs' request for punitive damages.

VIII.   Permanent Injunction

Plaintiffs seek a permanent injunction against defendants' continued "performance of [the Show], the performance of any sequence of two or more songs, any portion of the spoken text, or the Ellington and Soul Medleys from the [Show]." (Defs.'

Proposed Findings of Fact and Conclusions of Law ¶ 20.) Section 502 of the Act

provides that:

> Any court having jurisdiction of a civil action arising under this title may, subject
> to the provisions of section 1498 of title 28, grant temporary and final injunctions
> on such terms as it may deem reasonable to prevent or restrain infringement of a
> copyright.

17 U.S.C. § 502. The Court finds that the scope of plaintiffs' proposed permanent

injunction is overly broad, and further, that plaintiff has failed to submit any evidence

that there is a threat of continuing infringement. *Dolori Fabrics, Inc. v. The Limited*, 662

F. Supp. 1347, 1358 (S.D.N.Y. 1987); *Nimmer* § 14.06[B] at 14-122. Plaintiffs request

for injunctive relief is denied with leave to move within thirty (30) days for an

appropriately limited injunction based on a showing of a threat of further infringement.

## CONCLUSION

Subject to ruling upon any renewed motion for injunctive relief, the Court directs

entry of judgment in favor of plaintiffs and against defendants jointly and severally in the

amount of $33,889.80.[11]

Dated: New York, New York
      January 18, 2006

Richard J. Holwell
United States District Judge

---

[11] Also pending before the Court are two applications for sanctions. One application was made by WMK Productions, Inc. and Marion J. Caffey to obtain payment for expenses incurred by WMK and Caffey in making an earlier motion to compel. (*See* Defs.' Request For Monetary Sanctions For The Motion To Compel The Production Of Documents, filed Mar. 18, 2005 (Docket #35), at 2.) The second application was brought by Cook, Dixon and Young and arose out of their assertion that a portion of a copyright registration form had been "suppress[ed]" by WMK and Caffey's counsel. (*See* Notice of Motion for Sanctions, filed May 27, 2005 (Docket #73).) Both applications are denied in the Court's discretion. As reflected in the papers filed by each side in opposition to the applications, the conduct of counsel was substantially justified and any award of sanctions in these particular instances would not be just.